IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JULIET CHANDLER, | ) | No. 15 C 1306 |
| Plaintiff, | ) | |
| v. | ) | Magistrate Judge Sidney I. Schenkier |
| CAROLYN W. COLVIN, Acting Commissioner of the U.S. Social Security Administration, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

In this Social Security Appeal, claimant Juliet Chandler seeks judicial review under 42 U.S.C. § 405(g) of the final decision of defendant, the Commissioner of the Social Security Administration, denying her application for benefits. Before the Court are Ms. Chandler's motion to reverse or remand the Commissioner's decision (doc. # 13) and the Commissioner's cross-motion for summary judgment asking the Court to affirm the Commissioner's decision (doc. # 18). For the reasons that follow, we deny Ms. Chandler's motion to remand and grant the Commissioner's motion to affirm.

### I.

On May 3, 2011, Ms. Chandler filed an application for benefits alleging an onset date of October 3, 2010 -- at the age of 47 -- due to depression, anxiety, back injury, high blood pressure and diabetes (R. 175, 204). Her application was denied initially and on reconsideration, and Ms. Chandler was granted a hearing before an Administrative Law Judge ("ALJ"), which took place on July 19, 2012 (R. 53). On October 15, 2012, the ALJ issued a written decision denying Ms.

---

[1]On May 29, 2015, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 11).

Chandler's application (R. 30-42). The Appeals Council denied review (R. 11, 20), rendering the ALJ's decision the final decision of the Commissioner. *Hill v. Colvin*, 807 F.3d 862, 867 (7th Cir. 2015).

## II.

Ms. Chandler received most of her medical treatment from Primary Care Joliet ("PCJ"), except where stated below. At the end of July 2010, Ms. Chandler slipped and fell in a bath tub, and although her X-rays were normal, she complained of pain in her right hip and thigh and lower back (R. 346-47). Despite taking Flexeril (a muscle relaxant) and Darvocet (a narcotic pain reliever), Ms. Chandler reported continued pain at the end of August 2010, and she had difficulty ambulating and limited range of motion ("ROM") in her lumbar spine and right hip (R. 342-43). At the end of September 2010, Ms. Chandler also reported having major depression and decreased concentration, and she was prescribed sertraline (Zoloft) (R. 340-41).

On October 3, 2010, after approximately eight years working as a resident assistant at Joliet Junior College, Ms. Chandler took a medical leave of absence because she had a panic attack and was suffering from work-related stress (R. 55, 354). Ms. Chandler returned to work on November 4, 2010, but she lasted only one day because she had too much pain in her back and hips to continue her regular duties, such as packing students' belongings (R. 52-54). At that time, she was still taking Darvocet, as well as Naprosyn (NSAID) and Robaxin (for muscle spasms and pain) (R. 334).

Ms. Chandler's complaints of low back pain continued in April 2011, and she had limited ROM in her lumbar spine, as well as muscle spasm and stiffness (R. 332-33). At that time, her pain medication was switched from Darvocet and Naprosyn to Tramadol (narcotic pain medication), Diclofenac (NSAID), and Methocarbamol (for muscle spasms and pain) (R. 336-

2

37). In May 2011, an MRI of Ms. Chandler's lumbar spine showed mild degenerative facet changes, mild disc space narrowing and mild disc bulge at L4-L5, as well as mild anterolisthesis, a type of spondylolisthesis, where one vertebra slips forward on another vertebra (R. 474-75). A follow-up appointment on May 16 described her low back pain as chronic and moderate, but stable (R. 328-29). By that time, Ms. Chandler had stopped taking Tramadol and sertraline (R. 330).

That same month, Ms. Chandler and her husband of 26 years, Leroy, filled out function reports. Ms. Chandler described her daily activities as driving her husband to and from work, showering, light housework, washing clothes, and making dinner, with several periods of sitting and stretching in between (R. 226). She wrote that it was painful for her to bend, and she could not lift more than 10 pounds or stand for more than 15 minutes due to chronic pain (R. 226-27, 230). Socially, Ms. Chandler wrote that she spoke with her sister weekly, took her nieces and nephews out to places, and went to church sometimes (R. 229). She stated that her concentration was poor, but she likes to read (R. 230). Ms. Chandler had no problem adapting to changes in routine, but she did not handle stress well (R. 231). Her husband added that she liked writing and surfing the internet and spending time with others, and she has no problem getting along with others (R. 218-19).

On June 8, 2011, Ms. Chandler went to Silver Cross Hospital complaining of dizziness (R. 377). After an evaluation that returned normal findings, she was discharged home the same day, in good condition (R. 378-79). At a follow-up appointment later that month, the medical report stated that she continued to have moderate low back pain and moderate depression, but that these ailments were stable (R. 430-31).

On June 14, 2011, William N. Hilger, Ph.D., conducted psychological testing on Ms. Chandler for the Bureau of Disability Determination Services ("DDS"). Ms. Chandler reported that her marriage was going fairly well, but she felt depressed due to her circumstances and her early life, as she was molested as a child (R. 386). She stated that she did not sleep well -- about four hours a night -- and was taking Lexapro (*Id.*). Dr. Hilger observed that Ms. Chandler's memory, general knowledge, reasoning and judgment were fair (R. 386-87). He diagnosed her with adjustment disorder with depression, average intellectual functioning, and a GAF score of 55 to 60 (R. 387). He opined that Ms. Chandler could perform work involving understanding, memory, sustained concentration and persistence, and social interaction (R. 387-88). He also observed that Ms. Chandler had fairly normal gait and posture and showed no evidence of obvious pain behavior in walking, rising, sitting or standing (R. 385, 387).

On July 22, 2011, Phyllis Brister, Ph.D., completed a Psychiatric Review Technique form and mental residual functional capacity ("RFC") assessment for Ms. Chandler based on the medical record. Dr. Brister opined that Ms. Chandler had mild restrictions in activities of daily living ("ADLs") and social functioning, moderate limitations in concentration, persistence, and pace, and no episodes of decompensation of extended duration (R. 405). Dr. Brister found Ms. Chandler to be moderately limited in her ability to carry out detailed instructions but otherwise not significantly limited in other areas of understanding and memory, sustained concentration and persistence, and social interaction (R. 409-10). She opined that Ms. Chandler retained the ability to "understand, recall, and execute at least simple operations of a routine and semi-skilled nature" and that her "social and adaptive skills remain grossly preserved" (R. 411).

On July 9, 2011, ChukwuEmeka F. Ezike, M.D., M.P.H., conducted an internal medicine consultative examination for DDS (R. 390). Ms. Chandler described having constant, sharp back

4

pain which limited her to walking one block, standing for ten minutes, sitting for 20 to 30 minutes and lifting up to 10 pounds (*Id.*). Dr. Ezike observed that Ms. Chandler was unable to squat completely without support but could stand on each foot alone, was able to get on and off the examination table with no difficulty, could walk more than 50 feet without support, had a non-antalgic gait with no assistive devices, performed toe/heel walk with mild difficulty, and had normal ROM in her hips, knees, ankles and cervical spine (R. 392). The ROM in her lumbar spine was normal, but with mild pain and moderate to severe right paralumbar tenderness (*Id.*). Her straight leg test was negative and her motor strength was 5/5 in all limbs (*Id.*). On July 25, 2011, Towfig Arjmand, M.D., completed a physical RFC assessment based on the record, opining that Ms. Chandler could occasionally lift fifty pounds, frequently lift twenty-five pounds, and stand, walk, and sit for about six hours in an eight-hour workday, despite moderate to severe right paralumbar tenderness (R. 414-15, 417). Both Dr. Brister's and Dr. Arjmand's assessments were affirmed on reconsideration in October 2011 (R. 438-40).

Medical reports from follow-up appointments at PCJ in August 2011 noted that Ms. Chandler's impairments were stable or improving. The degeneration of her thoracic or lumbar intervertebral disc or lumbosacral intervertebral disc was listed as "improving" (R. 426). In addition, her diagnosis of major depressive disorder was listed as "stable" (R. 428).

On September 11, 2011, Ms. Chandler visited the emergency room at Silver Cross Hospital, complaining of palpitation episodes that lasted for thirty minutes (R. 544). She was diagnosed with having an anxiety reaction but was discharged home in good condition when her palpitations resolved that same day (R. 548).

On September 20, 2011, Ms. Chandler visited Anas Alzoobi, M.D., for evaluation of her low back pain (R. 538). Dr. Alzoobi reviewed her medical history, including the MRI of her

lumbar spine and her complaints of severe aching and throbbing pain at a level of seven out of ten if she stands or sits for too long or does certain housekeeping activities (*Id.*). Upon examination, she had pain in her lower back with the straight leg raise, pain on the right side upon flexion, extension and rotation; and moderate tenderness over the facet joint of the lumbar spine (*Id.*). Dr. Alzoobi prescribed Vicodin and scheduled an epidural steroid injection, and he recommended that Ms. Chandler start physical therapy to increase core muscle strength of the lumbar spine and lose weight, deeming her "moderate[ly]" obese at 5'7", 260 pounds (R. 538-39). On October 4, 2011, Dr. Alzoobi gave Ms. Chandler an epidural steroid injection in her lumbar spine (R. 537). Afterward, he observed that she ambulated freely without any assistance (*Id.*).

Ms. Chandler next visited Dr. Alzoobi on January 10, 2012 (R. 536). Ms. Chandler reported that the previous injection gave her pain relief for almost a month, and that despite running out of the "low dose" of Vicodin that Dr. Alzoobi had prescribed, "she was able to maintain pain somewhat under control by some activities and over the counter medication" (*Id.*). Dr. Alzoobi described her low back pain as axial (non-radiating) pain (*Id.*). He refilled Ms. Chandler's Vicodin prescription and gave her a lumbar epidural steroid injection (*Id.*). Ms. Chandler was able to ambulate freely after the procedure (*Id.*).

On February 14, 2012, Ms. Chandler returned to Dr. Alzoobi (R. 535). At that time, she was "doing very well" and "ambulating freely without any assistance," though she did "not do any exercise or anything" (*Id.*). Ms. Chandler reported that her pain was well controlled after her January 2012 injection (*Id.*). The pain started coming back progressively and she had tenderness in her lumbar spine, but the pain had not returned to the baseline and her lower back had good ROM with flexion and extension, and her straight leg raise was negative (*Id.*). Dr. Alzoobi

performed an epidural steroid injection, after which Ms. Chandler was able to ambulate freely without any assistance (*Id.*). On February 20, 2012, Ms. Chandler returned to PCJ complaining of bilateral hip pain, but denied difficulty ambulating (R. 529-30). Two months later, on April 20, 2012, Ms. Chandler again complained of pain, limited ROM, muscle spasm and muscle stiffness in her low back, and her prescription for Diclofenac (NSAID) was renewed (R. 522-23).

Ms. Chandler returned to Dr. Alzoobi for follow-up on May 8, 2012 (R. 557). She reported moderate to severe, non-radiating, pain over her lower back as she stands or tries to do any household activity (*Id.*). Upon examination, Ms. Chandler had pain with lumbar ROM, straight leg raise, flexion and extension (*Id.*). Dr. Alzoobi scheduled her for a median branch block of the lumbar spine, and recommended "aggressive physical therapy with strengthening exercise, work hardening [to] increase the build up and increase the strength of core muscle . . . and lose weight," all of which could allow Ms. Chandler to "control her pain for [a] long period of time" (*Id.*). He stated that if Ms. Chandler does not increase her strength and lose weight, she would need surgical intervention, but that would only work for a few months (*Id.*). On May 29, 2012, Dr. Alzoobi performed the bilateral median branch block (R. 558).

On June 16, 2012, Ms. Chandler received physical therapy (R. 468-70). On June 26, 2012, Dr. Alzoobi noted that Ms. Chandler was "still using [a] cane to ambulate," and her straight leg test was positive on the right side, with pain also upon flexion and extension (R. 559). Dr. Alzoobi increased her Vicodin dose and recommended that Ms. Chandler continue physical therapy (*Id.*).

### III.

On July 19, 2012, Ms. Chandler testified at a hearing before the ALJ. She stated that physical therapy was improving her back pain, and she planned to continue physical therapy for

7

two more weeks (R. 57). She was also taking hydrocodone two to three times per day, but it only gave her partial pain relief (R. 57-58). Ms. Chandler testified that she could stand for "a good half-hour" cooking, but then had to sit or lie down due to pain (R. 61). She was also able to clean a little bit at a time, resting in between when the pain starts (*Id.*). She often felt pain when she attempted to lift things, so she needed to assist her in carrying "the heavy stuff" while grocery shopping (R. 62-63). Ms. Chandler testified that she was prescribed a cane around February 2012, and that she used it "periodically" (R. 60).

Ms. Chandler testified that she drove daily, but entering and exiting the car was difficult (R. 62). She generally could not sit longer than one and a half to two hours before she had to stand up due to pain (R. 77). On a recent driving trip to Pennsylvania, she needed to stop about every two hours (R. 63). Ms. Chandler also had trouble sleeping: she testified that she woke up five times a night and slept a maximum of two hours straight (R. 72).

When she stayed at her sister's home in Pennsylvania, they did "basically the same stuff [she does] at home" (R. 64). They "sat around, [] laughed, played cards, cook[ed] together . . . clean[ed] together . . ." (*Id.*). However, Ms. Chandler testified that she was generally not involved in social activities: she played computer games and watched television, and she usually stayed quiet while others talked (R. 75-76). She further testified that she felt tired and overwhelmed, and she was agitated and irritable around everyone (R. 73).

Ms. Chandler also testified that she had panic attacks two or three times a week (R. 67). She stated that during an attack, she felt overwhelmed, her heart rate sped up, she sweat a lot, and she got dizzy and lightheaded for about 20 minutes (R. 67-68). However, she testified that she had not needed to go to the hospital for more than a year and a half for panic attacks because

she used breathing techniques to calm herself (R. 67, 69). In response to questions from her attorney, Ms. Chandler testified that she was also depressed and cried daily (R. 74-75).

A Vocational Expert ("VE") also testified at the hearing. The ALJ presented the VE with two hypotheticals, the first involving light work and the second involving sedentary work (R. 86-88). The sedentary hypothetical presented an individual who could lift and carry up to 10 pounds, stand and walk two hours in an eight-hour workday, sit six hours in an eight-hour workday but only sit for one hour continuously with five minutes every hour to stand, had limited exposure to environmental hazards and no exposure to hazardous machinery and heights, and was able to perform simple, routine, repetitive tasks; understand, remember, and carry out simple instructions; and occasionally interact with crowds and the public (R. 88-89). The VE opined that this individual would be unable to perform Ms. Chandler's past work as a resident counselor, but would be able to perform other sedentary and simple positions (R. 89-90). The VE further testified that the use of a cane to ambulate to the work station at any of these positions would not affect the individual's ability to perform those positions (R. 92).

The ALJ received additional evidence received after the hearing, including a July 31, 2012 medical report from Dr. Alzoobi (R. 560). At that follow-up visit, Ms. Chandler reported that "[h]er pain has kept bothering her somewhat," including pain in her left buttock, but that she "has started seeing improvement with physical therapy" (*Id.*). Nevertheless, she continued to take two to three tables of Vicodin daily (*Id.*). Upon examination, Dr. Alzoobi observed moderate to severe tenderness with pressure over the left sacroiliac joint (at the base of the spine) and radiating pain over the right sacroiliac joint upon flexion and rotation of the left hip, and Ms. Chandler ambulated freely with the assistance of a cane (*Id.*). Dr. Alzoobi recommended

continued physical therapy and tapering off of narcotic pain medication, unless the pain persisted, at which point he would do a sacroiliac joint injection (*Id.*).

## IV.

On October 15, 2012, the ALJ issued a written decision denying Ms. Chandler's claim for benefits. Initially, at Step 1, the ALJ found that Ms. Chandler has not engaged in substantial gainful activity since her alleged onset date of October 3, 2010 (R. 35). At Step 2, the ALJ determined that Ms. Chandler had the severe impairments of obesity, lumbar degenerative disc disease, spondylolisthesis and panic attacks (*Id.*). The ALJ found no evidence that Ms. Chandler's diabetes and hypertension caused any limitations (*Id.*).

Next, at Step 3, the ALJ determined that Ms. Chandler's impairments, alone or in combination, did not meet or medically equal a listed impairment, specifically considering Listing 1.04 for her back impairments (R. 36). With regard to her mental impairments, the ALJ found that they did not meet Listing 12.06 because the paragraph B criteria were not met (R. 36). The ALJ found Ms. Chandler had only mild restriction in ADLs because though she reported some pain and difficulty in personal care, she was able to prepare meals, clean, wash clothes and grocery shop, so long as she took frequent breaks (*Id.*). The ALJ also found Ms. Chandler had mild difficulties in social functioning because although she reported that she does not spend time with others and can be irritable due to lack of sleep, she traveled to Pennsylvania to visit her family, where they "talked and laughed." (*Id.*). The ALJ found Ms. Chandler had moderate difficulties in concentration, persistence, and pace because she reported that her impairments affect her ability to complete tasks, and she followed written instructions very well, but not spoken instructions (*Id.*). In addition, Ms. Chandler had not experienced episodes of decompensation (*Id.*).

The ALJ determined that Ms. Chandler had the residual functional capacity ("RFC") to perform sedentary work (can lift and carry up to ten pounds) and could stand and walk two hours total in an eight-hour day, but not climb ladders, ropes or scaffolds and only occasionally balance, stoop, kneel, crouch and crawl (R. 37). In addition, the ALJ found that she could sit for six hours total in an eight-hour workday but needed to stand for at least five minutes after sitting for one hour (*Id.*). The ALJ further limited her to performing simple, routine, repetitive tasks, and understanding, remembering, and carrying out simple instructions, with occasional interaction with crowds and the public (*Id.*).

The ALJ then reviewed Ms. Chandler's subjective complaints of her physical and mental impairments and compared them with the objective medical evidence in the record. With regard to her physical impairments, the ALJ noted that Ms. Chandler complained that severe pain in her low back, right hip and knees often made it hard for her to walk and stand, and she used a cane periodically to help her with stability (R. 38). She also complained of back and right hip pain after she fell in the shower in August 2010 (*Id.*).

Despite a referral for physical therapy in October 2010, the ALJ noted that Ms. Chandler "only attended two sessions and then she discontinued the services" (R. 38). The ALJ also noted that an MRI of her lumbar spine in May 2011 showed that Ms. Chandler had mild degenerative changes in her lower lumber spine, including anterolisthesis of L4-L5, mild disc bulge, and minimal narrowing (*Id.*). In addition, the ALJ considered the DDS examination in July 2011, which noted that Ms. Chandler was obese but in no acute distress, had a non-antalgic gait without the use of assistive devices, could walk greater than 50 feet without support, had negative straight leg raise, and normal ROM in her hips, knees and ankles (*Id.*). On the other hand, she was unable to squat completely without support, had mild difficulty performing the

toe/heel walk, had mild pain with normal ROM in her lumbar spine, and moderate to severe right paralumbar tenderness (*Id.*).

The ALJ also reviewed Ms. Chandler's visits with Dr. Alzoobi for back pain (R. 38). The ALJ noted that at the first appointment with Dr. Alzoobi in September 2011, her straight leg raise, flexion, extension and rotation were positive for pain in her low back, and she was prescribed Vicodin and advised to start physical therapy (R. 39). The ALJ explained that subsequently, Ms. Chandler received three epidural steroid injections, which provided temporary (one to two months) pain relief (*Id.*). In May 2012, Dr. Alzoobi recommended that she have a bilateral medial block, aggressive physical therapy with strengthening, and work hardening so that she could build core muscle that could control her pain for a long period of time (*Id.*). Finally, in July 2012, Ms. Chandler was ambulating freely with the assistance of a cane, and her hip joint had full ROM with flexion and extension, though she had pain in her left buttock and moderate to severe tenderness and pressure over the sacroiliac joint (*Id.*).

With regard to her mental impairments, the ALJ noted that Ms. Chandler testified that she had panic attacks two to three times per week, where she felt overwhelmed, dizzy and lightheaded (R. 38). In addition, Ms. Chandler complained to her primary care physician at times that she felt depressed or edgy and had trouble sleeping, and she began taking Lexapro in November 2010 (R. 39). The ALJ also reviewed the DDS psychological testing from June 2011 and Ms. Chandler's brief hospitalization in September 2011 for a panic attack (*Id.*).

Ultimately, the ALJ concluded that Ms. Chandler's allegations concerning the limiting effects of her impairments were "just not supported by the objective medical evidence" (R. 40). The ALJ pointed to Dr. Alzoobi's July 2012 report as showing that Ms. Chandler was capable of sedentary work: "she was ambulating freely with the assistance of a cane," "[s]he had good

12

results from physical therapy," "Vicodin was controlling her pain," and "[s]urgery was not recommended" (*Id.*). The ALJ also found that "her panic attacks seemed to be controlled with medication" (*Id.*). In addition, the ALJ found that Ms. Chandler's testimony was inconsistent because she testified that she visited her family in Pennsylvania where they "talk[ed], laugh[ed], cook[ed], and play[ed] cards," but she also testified that she was irritable with everyone, including her family (*Id.*).

The ALJ gave great weight to Dr. Brister's July 2011 psychological opinion, finding her opinion supported by the record (R. 40). However, despite finding that Ms. Chandler had only mild difficulties in maintaining social functioning, the ALJ reduced social interactions in the RFC to account for Ms. Chandler's testimony about irritability (*Id.*). The ALJ also gave great weight to Dr. Hilger's opinion that she could perform work-related activities involving understanding, memory, sustained concentration, social interaction, and adaptation (*Id.*). The ALJ gave state agency consultant Dr. Arjmand's July 2011 opinion that Ms. Chandler could perform medium work only "slight weight" because "evidence later received . . . [p]articularly, her pain treatment with Dr. Alzoobi," showed that Ms. Chandler should be limited to sedentary work (*Id.*). The ALJ also gave some weight to the report from Ms. Chandler's husband, to the extent that it was consistent with the objective medical evidence (R. 41).

Ultimately, the ALJ determined that Ms. Chandler was unable to perform past relevant work, but that based on the testimony of the VE, there were a significant number of jobs that Ms. Chandler could perform (R. 42-43).

## V.

"We review the ALJ's decision deferentially only to determine if it is supported by substantial evidence," *i.e.*, "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014) (internal citations and quotations omitted). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

Ms. Chandler argues that we should remand here because: (1) the ALJ's RFC assessment failed to account for her need to use a cane; and (2) the ALJ's credibility determination was not supported by substantial evidence (doc. # 14: Pl.'s Mem. in Supp. of Summ. J. at 5). We consider, and reject, each of these challenges.

**A.**

Ms. Chandler contends that the ALJ "fail[ed] to address or account" for her use of a cane in her RFC, and that the VE did not adequately consider the effect that her use of a cane would have on the sedentary jobs the VE said were available (Pl.'s Mem. at 6-7). As explained above, the ALJ did review the evidence of Ms. Chandler's use of a cane, and "we read the ALJ's decision as a whole" to determine whether the ALJ adequately addressed the evidence underlying her RFC assessment. *Summers v. Colvin*, No. 15-1819, 2016 WL 423711, at *3 (7th Cir. Feb. 4, 2016).

In her opinion, the ALJ accurately noted that Ms. Chandler testified that she had used a cane for stability "periodically" since February 2012, and that Dr. Alzoobi observed her "ambulating freely with the assistance of a cane" in July 2012 (R. 38-40). It was this testimony and Dr. Alzoobi's medical reports that led the ALJ to give only slight weight to Dr. Arjmand's July 2011 opinion that Ms. Chandler could perform medium work (R. 40). Instead, the ALJ

14

found that Ms. Chandler's testimony and Dr. Alzoobi's July 2012 report demonstrated that Ms. Chandler was only capable of sedentary work, with the additional limitations that she be able to stand every hour for five minutes.

The RFC crafted by the ALJ adequately accounted for the additional limitations the ALJ found based on Ms. Chandler's testimony and Dr. Alzoobi's reports. Social Security Regulation ("SSR") 96-9p states that "[s]ince most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand." SSR 96-9p. SSR 96-9p further states that "[i]n these situations, . . . it may be especially useful to consult a vocational resource in order to make a judgment regarding the individual's ability to make an adjustment to other work." *Id.* At the hearing in this case, the VE did testify as to the effect the use of a cane would have on Ms. Chandler's ability to perform sedentary work. In response to Ms. Chandler's attorney's question of whether the use of a cane in any of the sedentary positions the VE described would affect the employee's ability to perform those positions, the VE stated that "us[ing] a [cane] to ambulate to the work station . . . would not affect the positions" (R. 92).

Ms. Chandler contends that by specifying that the use of a cane would be "to ambulate to the work station," the VE "implie[d] that the cane should not be used in the performance of job duties -- such as 'stand[ing] and/or walk[ing] 2 hours total' and 'carrying[ing] up to 10 pounds' as stated in the residual functional capacity finding" (Pl.'s Mem. at 7). However, this argument draws too fine a distinction under SSR 96-9p. At a sedentary work position, any standing or walking in performance of the job would necessarily involving ambulating to and from the

employee's work station. Thus, we find that the ALJ reasonably could find that the VE's testimony here confirmed, as recommended by SSR 96-9p, that Ms. Chandler's use of a cane would not affect her ability to perform sedentary work.

The analysis in *Baker v. Comm'r of Soc. Sec.*, 384 F. App'x 893 (11th Cir. 2010), is useful here. In *Baker*, the claimant had argued that the ALJ erred in finding that he had the RFC to perform the full range of sedentary work because he needed to use a cane. *Id.* at 895. However, the Eleventh Circuit held that the ALJ's determination was supported by substantial evidence because the ALJ did not need to perform "a function-by-function analysis of the effects of [the claimant's] cane on specific basic sedentary work skills" where the ALJ had found that the claimant "was able to walk effectively with [the] assistance" of a cane. *Id.* Moreover, "[a]lthough some of the reporting physicians noted that [the claimant] require[d] a cane to walk, no physician of record rendered an opinion that suggest[ed] that the cane limit[ed] his ability to comply with the exertional requirements of sedentary work." *Id.* at 895-96. Similarly, in this case, Dr. Alzoobi observed that Ms. Chandler walked effectively with the use of a cane, and there were no opinions or testimony in this case suggesting that Ms. Chandler's periodic use of a cane limited her ability to perform sedentary work.

Ms. Chandler's reliance on *Thomas v. Colvin*, 534 F. App'x 546 (7th Cir. 2013), is unavailing. In *Thomas*, the Seventh Circuit held that remand was necessary because the ALJ "ignored virtually all the evidence in the record demonstrating that the claimant . . . needed a cane in order to stand or walk." *Id.* at 550. Here, by contrast, the ALJ reviewed all of the evidence in the record regarding Ms. Chandler's use of a cane, and in light of that evidence, reasonably found that Ms. Chandler could performed a reduced range of sedentary work.

**B.**

Ms. Chandler also contends that the ALJ erred in concluding that Ms. Chandler's allegations of disability were not fully credible (Pl.'s Mem. at 8-15). We disagree.

In assessing a claimant's credibility, the ALJ must consider several factors, including the claimant's daily activities, the degree of her pain or intensity of her symptoms, aggravating factors, medications, and treatment. 20 C.F.R. § 404.1529(c). Since the ALJ issued her decision in this case, the Social Security Administration has updated its guidance regarding the evaluation of symptoms in disability claims to eliminate the term "credibility" and "clarify that subjective symptom evaluation is not an examination of the individual's character." SSR 16-3p, 2016 WL 1119029, at *1 (effective Mar. 28, 2016). However, SSR 16-3p -- like SSR 96-7p, which it superseded -- continues to instruct ALJs to evaluate the intensity, persistence, and limiting effects of a claimant's symptoms by considering "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Compare* SSR 96-7p *with* SSR 16-3p.[2]

The legal standard for review of an ALJ's credibility determination is well-settled in the Seventh Circuit. We give deference to the ALJ's credibility decision "[b]ecause the ALJ is in the best position to determine a witness's truthfulness and forthrightness . . ." *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015) (internal quotations and citations omitted). "So long as an ALJ

---

[2]We defer to the Social Security Agency's statement that SSR 16-3p was merely a clarification of the existing law on credibility. *Clay v. Johnson*, 264 F.3d 744, 749 (7th Cir. 2001). A rule, such as this one, "simply clarifying an unsettled or confusing area of the law . . . does not change the law, but restates what the law according to the agency is and has always been. A clarifying rule, therefore, can be applied to the case at hand just as a judicial determination construing a statute can be applied to the case at hand." *Id.* (internal citations and quotations omitted). Regardless, the SSA's recent clarification of the credibility standards does not affect the outcome in this case.

gives specific reasons supported by the record, we will not overturn his credibility determination unless it is patently wrong." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015). *See also Green v. Colvin*, 605 F. App'x 553, 558 (7th Cir.), cert. denied, 136 S. Ct. 187 (2015) (an ALJ's credibility determination will stand where "the ALJ has offered reasons grounded in the evidence that support her determination"). Here, the ALJ provided reasons, grounded in evidence, for discounting Ms. Chandler's credibility.

The ALJ determined that Ms. Chandler's allegations concerning the limiting effects of her impairments were "just not supported by the objective medical evidence" (R. 40). As to Ms. Chandler's physical impairments, the ALJ reasoned that the following evidence undermined Ms. Chandler's allegations that her pain was disabling: (1) she was prescribed physical therapy for her back pain as early as October 2010, but discontinued physical therapy after only two sessions (R. 38); (2) the July 2011 DDS examination found that Ms. Chandler had a non-antalgic gait without the use of assistive devices and could walk greater than 50 feet without support (*Id.*); (3) Dr. Alzoobi prescribed physical therapy in September 2011, but Ms. Chandler did not re-start physical therapy until the summer of 2012, at which time Dr. Alzoobi recorded that she had a "good result" after three weeks of physical therapy (R. 39); (4) Dr. Alzoobi opined that with aggressive physical therapy and work hardening, Ms. Chandler would be able to control her pain for a long period of time (*Id.*); (5) Dr. Alzoobi observed that Ms. Chandler could ambulate freely with the assistance of a cane and had full ROM with flexion and extension (*Id.*); and (6) Vicodin was controlling her pain (R. 40). The ALJ also provided sound reasons for discounting Ms. Chandler's allegations of disabling mental impairments, including that: (1) she prepares meals, cleans, washes clothes, drives and grocery shops, with frequent breaks (R. 36); (2) the state agency examination and RFC did not find that her mental impairments were disabling (R. 39-

40); (3) her panic attacks seemed to be controlled with medication (R. 40); and (4) Ms. Chandler traveled to Pennsylvania to visit her family where they "talk[ed], laugh[ed], cook[ed], and play[ed] cards" (*Id.*).

Ms. Chandler argues that the ALJ's credibility determination was erroneous because the evidence could be construed as consistent with Ms. Chandler's allegations that her impairments were disabling (Pl.'s Mem. at 8-11). However, our review of an ALJ's credibility determination is extremely deferential. Simply because certain evidence might be construed as supporting Ms. Chandler's disability claim does not mean that the ALJ patently erred in construing the evidence as enabling Ms. Chandler to perform a limited range of sedentary work. Indeed, as explained below, we find that the ALJ considered the record as a whole and provided sufficient reasons for her credibility determination, which were supported by the record. *See Slayton v. Colvin*, 629 F. App'x 764, 770 (7th Cir. 2015) (collecting cases upholding ALJs' adverse credibility decisions based on normal examination findings, daily activities, conservative treatment, and inconsistent testimony).

For example, Ms. Chandler contends that the May 2011 MRI was consistent with her allegations of physical disability and that the ALJ erred by not explaining how she accounted for the MRI results in the RFC (Pl.'s Mem. at 8). It is well settled that an ALJ need not specifically address every piece of evidence so long as she provides a "logical bridge" between the evidence and her conclusions. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). In this case, however, the ALJ's opinion did address the results of the MRI of Ms. Chandler's lumbar spine, including that Ms. Chandler had only mild degenerative changes, mild disc bulge, and minimal narrowing (R. 38). Moreover, the ALJ relied on Dr. Alzoobi's reports, which relied on these MRI findings (R. 39-40), and Ms. Chandler does not point to any medical evidence in the record showing that

Ms. Chandler's physical impairments go beyond these mild findings. The ALJ's consideration of the MRI results was thus sufficient and did not make the credibility determination erroneous. *See Michalec v. Colvin*, 629 F. App'x 771, 775 (7th Cir. 2015) (holding that the ALJ did not err by not specifically considering imaging results where the ALJ relied on a doctor's report which had relied on those results, and no treating physicians offered contrary opinions about his ability to perform most of the activities of sedentary work); *see also Green*, 605 F. App'x at 558 (finding no patent error in the ALJ's credibility finding where the ALJ did not provide further analysis of imaging tests that "did not confirm anything significant").

Ms. Chandler also contends that the ALJ should have found that Dr. Alzoobi's reports supported her allegations of disability instead of qualifying her for sedentary work (Pl.'s Mem. at 9-10). The ALJ reviewed the findings in Dr. Alzoobi's most recent reports in the record -- including that despite some continued pain, Ms. Chandler was able to ambulate freely using a cane, had "good result" from starting physical therapy, her pain was controlled with Vicodin, and surgery was not recommended -- and concluded that they showed Ms. Chandler could perform a limited range of sedentary work (R. 40). Ms. Chandler claims that this conclusion was error because the ALJ failed to adequately consider that: she had previously had steroid injections and medial branch blocks; she had continued tenderness with pressure over her sacroiliac joint and radiating hip pain with motion; Dr. Alzoobi would do a sacroiliac joint injection if her pain continued; and Dr. Alzoobi did not recommend surgery because it would ease her pain only temporarily (Pl.'s Mem. at 10).

Contrary to Ms. Chandler's arguments, the ALJ did take into account her residual pain and the treatments she had received for her pain. Nevertheless, the ALJ properly found that the pain did "not equate with disability." *Stepp*, 795 F.3d at 721. The ALJ considered the injections

and medicine Dr. Alzoobi prescribed to Ms. Chandler to relieve her pain, and consequently crafted an RFC for Ms. Chandler that was much more limited than the medium work recommended by the state agency physicians. The ALJ also properly considered Dr. Alzoobi's opinion that Ms. Chandler might be able to control her pain with additional physical therapy and weight loss, and reasonably concluded that the evidence supported a finding of not disabled (R. 39-40).

Likewise, contrary to Ms. Chandler's arguments (Pl.'s Mem. at 11), the ALJ did not err in finding that Ms. Chandler's testimony did not demonstrate that she was disabled due to her mental health impairments. Although Ms. Chandler testified that she suffered panic attacks every week, the ALJ assigned great weight to the DDS mental health evaluation and assessment, which concluded that Ms. Chandler's mental health impairments did not render her disabled (R. 40).[3] In the absence of any treating source opinion on Ms. Chandler's functional limitations from her mental health impairments -- and in the absence of any challenge by Ms. Chandler to the weight the ALJ gave to the mental health DDS assessments -- it was not error for the ALJ to rely on the uncontradicted expert opinions of Drs. Brister and Hilger. *See Summers*, 2016 WL 423711, at *3.

Nor did the ALJ err in finding that Ms. Chandler's ADLs are inconsistent with her alleged impairments (Pl.'s Mem. at 12). An ALJ should consider a claimant's description of her daily activities in assessing whether her testimony about the intensity, persistence, and limiting effects of her impairments was credible, *i.e.*, whether the claimant's ADLs were consistent with her allegations of disability. *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016). In so doing, the ALJ must recognize that "a person's ability to perform daily activities, especially if that can

---

[3]Ms. Chandler's argument that a change in her medication from Zoloft to Lexapro in late 2010 shows that her panic attacks were not controlled with medication warrants little discussion (Pl.'s Mem. at 11). This medication change happened almost a year before the DDS mental health assessments found that Ms. Chandler was not disabled due to her mental health impairments.

be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013).

The ALJ here did not conflate Ms. Chandler's ability to perform daily activities with her ability to work full-time. The ALJ considered her daily activities -- which included preparing meals, cleaning, washing clothes, driving and grocery shopping -- and acknowledged that Ms. Chandler testified that she performed them while taking frequent breaks (R. 36). In addition, we find no error in the ALJ's determination that Ms. Chandler's Pennsylvania visit -- where she laughed, played, cooked and cleaned with her family -- was inconsistent with her alleged mental health limitations (R. 40). Ms. Chandler's attempt to reconcile her testimony that she was irritable with everybody by distinguishing between "the time [she] spends with her nuclear family, as opposed to her extended family, outside of the trip to Pennsylvania" (doc. # 20: Pl.'s Reply at 5-6), draws too fine a distinction, which was not evident in Ms. Chandler's testimony or in the record. Thus, the ALJ did not err in finding that Ms. Chandler's ADLs were consistent with an RFC that limited her to work that allowed her to stand for five minutes after sitting for one hour.

Finally, Ms. Chandler argues that the ALJ failed to properly consider the effect her obesity had on her impairments when determining her credibility (Pl.'s Mem. at 14). This argument is a non-starter. Like the ALJ in *Shumaker v. Colvin*, 632 F. App'x 861, 867 (7th Cir. 2015), the ALJ here determined that Ms. Chandler's obesity was a severe impairment and incorporated several of the limitations described in SSR 02-1p (regarding evaluation of obesity) into her RFC, including limitations on balancing, stooping, crouching, climbing ramps and stairs, and handling hazards (R. 35-37). Ms. Chandler "does not identify any evidence in the record that suggests greater limitations from her obesity than those identified by the ALJ, and neither does

she explain how her obesity exacerbated her underlying impairments." *Shumaker*, 632 F. App'x at 867. Thus, as in *Shumaker*, even if the ALJ had erred in considering how Ms. Chandler's obesity affects her ability to work, that error would be harmless. *Id.* at 868.

## CONCLUSION

For the aforementioned reasons, we deny Ms. Chandler's motion to remand (doc. # 13) and grant the Commissioner's motion to affirm the denial of disability benefits (doc. # 18). This case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATE: May 25, 2016